# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **STEPHANIE L. CARTER-KUEHNER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:08-CV-00291** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Stephanie Carter-Kuehner ("Kuehner") appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) Kuehner appealed the Commissioner's decision, and the appeal was referred to the undersigned Magistrate Judge on December 10, 2008, by District Judge Theresa Springmann for the issuance of a Report and Recommendation. (Docket # 1, 5.)

Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(d)(1), the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED. This Report and Recommendation is based on the following facts and principles of law.

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

# I. PROCEDURAL HISTORY

Kuehner applied for DIB and SSI on February 17, 2004, alleging that she became disabled as of August 2, 1999. (Tr. 20, 67, 69.)  The Commissioner denied her application initially and upon reconsideration, and Kuehner requested an administrative hearing. (Tr. 47-56.) A hearing was conducted by Administrative Law Judge ("ALJ") Steven J. Neary on October 19, 2006, at which Kuehner (who was represented by counsel) and a vocational expert testified. (Tr. 1036-60.)

On June 11, 2007, the ALJ rendered an unfavorable decision to Kuehner, concluding that she was not disabled because she could perform her past relevant work as a press tender despite the limitations caused by her impairments. (Tr. 20-31.)  The Appeals Council denied Kuehner's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 6-8.) Kuehner filed a complaint with this Court on December 4, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.)

# II. KUEHNER'S ARGUMENTS

Kuehner alleges five flaws with the Commissioner's final decision.  Specifically, Kuehner claims that: (1) the ALJ failed to properly evaluate the opinion of Ms. Susan Miller, Kuehner's treating mental health therapist, and Dr. Sylvia Rutten, her treating psychiatrist; (2) the ALJ erred by not giving full effect to Kuehner's uncontrolled diabetes when determining her residual functional capacity ("RFC"); (3) the ALJ's determination that Kuehner could perform her past relevant work is wholly inconsistent with the evidence presented; (4) the ALJ's determination that Kuehner is capable of performing sustained work on a regular and continuing basis is not supported by substantial evidence; and (5) the ALJ improperly determined that

Kuehner's testimony was not credible. (Mem. in Opp'n to Secretary's Decision Denying Pl.'s Claim for Benefits and Req. for Remand ("Opening Br.") 8-18.)

## III.  FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Kuehner was thirty-five years old; had a high school degree with some participation in special education classes and one year of college; and had worked in a variety of jobs, including as an assistant manager, cashier, factory laborer, janitor, kitchen assistant, and sales clerk. (Tr. 67, 93, 124-25.)  Kuehner alleges that she is disabled due to uncontrolled diabetes mellitus, type I; hypothyroidism; post traumatic shock syndrome ("PTSD"); attention deficit hyperactive disorder ("ADHD"); learning disorders, and bipolar I disorder. (Opening Br. 6.)

### B. Kuehner's Testimony at the Hearing

At the hearing, Kuehner testified that she lives alone in an apartment and that she independently performs her self care, household tasks, meal preparation, budgeting, and shopping, though she at times has difficulty buttoning her clothing. (Tr. 1040, 1043-44, 1051.) In describing her typical daily routine, Kuehner reported that she attends Indiana University-Purdue University Fort Wayne ("IPFW") three days a week for three hours a day, but that she stays home "pretty much the rest of the time." (Tr. 1044.)  She drives a car, stating that she drives two miles to school each way. (Tr. 1045.)  Kuehner confided that she does not have many friends and is not very social, but in her leisure time she enjoys following NASCAR, collecting baseball caps, and watching television. (Tr. 1045, 1052.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 1060-page administrative record necessary to the decision.

When asked why she thought she could not perform her past work, Kuehner stated that she cannot sit or stand for long periods of time because of the constant pain in her legs, feet, and hands. (Tr. 1041.)  She stated that it feels as if "somebody [is] just punching needles into my legs and feet", and that her pain is aggravated if she walks or sits too long or "even if a sheet brushes [her] legs in the middle of the night". (Tr. 1042.)  Kuehner stated that she takes medication for her pain but that it makes her drowsy and does not help; she confided that elevating her legs makes "a little difference" in decreasing her leg pain, though she does not do so at school. (Tr. 1041-42, 1050.)  She also complained that her feet have felt numb for the last three years. (Tr. 1049.)

As to her physical capacity, Kuehner testified that she can walk for "maybe a half" of a block, stand for ten minutes, and sit for twenty minutes. (Tr. 1042.)  She also reported that her ability to lift is affected by a "catch in [her] back", explaining that she lifts only one-half of a laundry load or one or two plates at a time when loading the dishwasher. (Tr. 1043.)  Kuehner elaborated that she "can't hang onto things" due to pain in her hands and that she can only write for ten minutes at a time. (Tr. 1043, 1052.)  In addition, she reported that she has the "beginning stages of cataracts" in her eyes, which affects her nighttime vision "a little bit". (Tr. 1043.)

Kuehner also articulated that she has an insulin pump, but that she is still unable to keep her sugars under control. (Tr. 1048.)  She stated that when her sugars drop she "get[s] real tired and weak and . . . can't do anything" and that she usually takes some glucose tablets and then naps until her sugars come back up. (Tr. 1048-49.)  She further explained that when her sugars get too high, she gets bad headaches and feels very tired, and she usually takes insulin and needs to lie down. (Tr. 1048-49.)  She stated that these incidences occur "[a]bout four or five times a

week." (Tr. 1049.)

In addition, Kuehner testified that she has difficulty with her attention span due to ADHD and that she suffers from mood swings. (Tr. 1045, 1052.) She explained that she will forget to finish tasks and that her "mind races." (Tr. 1045.) Kuehner also reported that she has dyslexia and that she reads at about a seventh grade level. (Tr. 1046.) She stated that IPFW provides her with accommodations, such as having tests read to her and taping lectures. (Tr. 1046-47.)

   *C. Summary of the Medical Evidence Concerning Kuehner's Physical Impairments*

Kuehner has had insulin-dependent diabetes mellitus since age eighteen months. (Tr. 225.)

On November 7, 2002, Kuehner visited Dr. Steven Wynder of Orthopaedics Northeast for right thigh and knee pain of one-month duration. (Tr. 314.) Her pain extended from her knee to her thigh and she walked with a limp. (Tr. 314.) She returned one month later and reported that her pain no longer radiated to her hip area, stating that the pain had improved considerably since her last visit. (Tr. 313.) Dr. Wynder released her to perform her desired activities, leaving her to impose her own limitations based on her pain levels; he opined that there was no indication for more aggressive intervention at that time. (Tr. 313.)

On January 18, 2003, Kuehner was evaluated by Dr. Cassandra Kovach. (Tr. 358-59.) Upon examination, Kuehner exhibited decreased sensation in her lower extremities, but normal gait and station and range of motion. (Tr. 358.) Dr. Kovach noted her history of peripheral neuropathy, but concluded that her complaints did not affect her daily life activities. (Tr. 359.)

On February 25, 2003, Kuehner's vision was evaluated by Dr. Daniel Diedrich of Marion Eye Care Associates. (Tr. 364-65.) He noted that Kuehner had background diabetic neuropathy

and that she may need laser treatment in the future if her diabetic changes increase, though no treatment was currently necessary. (Tr. 365.) He opined that there were no working conditions or activities that needed to be avoided due to her condition. (Tr. 365.) In fact, on March 6, 2003, Dr. Diedrich by separate letter penned that though Kuehner suffers from diabetes, he found "no eye-related issues that would prevent [her] from working or enjoying recreational activities." (Tr. 373.)

On March 25, 2004, Kuehner underwent an endocrine consultation by a nurse practitioner of Indiana Medical Associates, LLC, for assistance with managing her diabetes. (Tr. 515-18.) She diagnosed her with diabetes type I poor control, erratic sugars, with hyperglycemia and hypoglycemia, and a history of diabetic ketoacidosis but none recently; she further noted that Kuehner's neuropathy was mild and that she had no known retinapathy. (Tr. 517.) A plan was developed to improve Kuehner's diabetic care, with the long term goal of obtaining an insulin pump. (Tr. 517.)

On April 17, 2004, Kuehner was evaluated by Dr. Yaroslav Pogorelov. (Tr. 519-22.) He assigned her diagnoses of diabetes mellitus type I with poor control and history of hospitalization for diabetic ketoacidosis; difficulty with breathing, secondary to asthma attacks; and depression in poor control. (Tr. 521.) He opined: "The patient's daily life activities are affected by the conditions described above such as seeing is affected. Sitting, standing, walking, lifting, carrying and handling objects, hearing and speaking are not affected." (Tr. 521.) He encouraged Kuehner to gain better control of her diabetes, to quit smoking, and to get her vision corrected by an ophthalmologist. (Tr. 521.)

On August 9, 2004, Kuehner visited the Cataract & Laser Institute, and it was determined

that she had early cataracts and diabetic neuropathy without significant macular edema. (Tr. 573.)

Kuehner was re-evaluated by Dr. Pogorelov on September 25, 2004. (Tr. 581-83.) He assigned her diagnoses of diabetes mellitus, type I, poorly controlled, complicated by neuropathy, nephropathy, and retinapathy; and attention deficit disorder. (Tr. 582.) He observed that her gait and station were normal and that she was able to squat, rise, and walk on heels and toes without difficulty; yet, he opined that he did not think Kuehner could stand or walk for two hours in an eight-hour day due to her lower extremity pain and neuropathy. (Tr. 582.) He again encouraged Kuehner to pursue a diabetic diet and smoking cessation. (Tr. 582-83.)

In April 2005, Kuehner was evaluated by Dr. Louis Lopez from a cardiac perspective due to complaints of discolored toes. (Tr. 894.) After testing, Dr. Lopez concluded that the discoloration may be due to vasospasm but it was clearly not due to structural heart disease. (Tr. 894.)

In May 2005, Kuehner underwent a carpal tunnel release on her right hand and subsequently noted improvement in her numbness and paresthesias. (Tr. 706.) Dr. James Dozier noted that Kuehner also experienced symptoms of carpal tunnel syndrome in her left hand and thus prescribed a splint for her to wear. (Tr. 706.) On October 26, 2005, Kuehner underwent surgery for a trigger thumb, which was a "straightforward local procedure." (Tr. 747.) Dr. Dozier opined that she had no disability from either her carpal tunnel surgery or her trigger thumb surgery. (Tr. 747.) On September 23, 2005, Kuehner had an EMG of her right arm, which suggested mild polyneuropathy and no evidence of carpal tunnel syndrome, indicating that the carpal tunnel surgery was successful. (Tr. 918-19.)

On August 1, 2006, Kuehner underwent a follow-up cardiac evaluation by Dr. Lopez. (Tr. 891.) Dr. Lopez was "very pleased" with the test results, which indicated no evidence of ischemia or infarct, normal ventricular systolic function, a structurally normal heart, no cardiomegaly and no left ventricular hypertrophy, no hemodynamically significant stenosis in either lower extremity, and mild mitral and tricuspid regurgitation with normal right-sided pressures. (Tr. 891.)

*D. Summary of the Medical Evidence Concerning Kuehner's Mental Impairments*

On September 8, 2002, Kuehner underwent a mental status examination by Paul Martin, Ph.D. (Tr. 200-08.) He observed that she was cooperative, followed directions well, paid close attention to detail, maintained a quick work pace, and implemented problem solving techniques. (Tr. 203.) He thought that her "presentation and manner could serve her well, vocationally." (Tr. 203.) Intelligence testing showed normal range of intelligence with strength on the nonverbal side and relative weakness on the verbal side, and a learning disability with specific weakness in spelling. (Tr. 204, 208.) Dr. Martin thought that the test results were "generally encouraging" from a vocational perspective in that he thought Kuehner should encounter little or no difficulty in training and employment at the unskilled or semi-skilled level. (Tr. 205.) He noted that though she is functionally literate, she would be better suited to "learn-by-doing approaches to jobs". (Tr. 205.)

With respect to her emotional status, Dr. Martin noted that Kuehner displayed some flatting of mood and constriction of affect, but that her performance was otherwise in the normal range. (Tr. 205.) He diagnosed her with dysthymic disorder, which he thought to be "of mild proportions", and a learning disorder. (Tr. 206, 208.) He thought that from a vocational

perspective, the results suggest that Kuehner "should be able to press ahead, straight away", opining that she would likely experience symptom remission upon return to full time employment. (Tr. 207.)

On October 24, 2002, Kuehner underwent a mental health assessment by a counselor at the Bowen Center, who encouraged her to participate in individual therapy. (Tr. 264-66, 427-31.) She diagnosed her with bipolar I disorder, depressive episode, moderate, and PTSD. (Tr. 427, 428-31.)

On March 3, 2003, Kuehner underwent a psychological evaluation by Candace Martin, Psy.D. (Tr. 368-71.) As a result of mental status testing, Dr. Martin deduced that Kuehner had low average intelligence and that her memory was somewhat weak; she further observed that Kuehner was "able to communicate effectively, interact with others, focus her attention and sustain concentration, and complete tasks in a timely manner." (Tr. 370-71.) Dr. Martin diagnosed Kuehner with dysthymic disorder and assigned her a Global Assessment of Functioning ("GAF") score of 65, indicating mild symptoms.[3] (Tr. 371.) She also opined that Kuehner's ability to function independently was "fairly normal", that she could manage her own funds, and that she appeared "capable of gainful employment." (Tr. 371.)

On April 28, 2003, K. Neville, Ph.D., reviewed Kuehner's record and opined that she had no restriction of daily living activities; no difficulties in maintaining social functioning; no episodes of decompensation; and mild difficulties in maintaining concentration, persistence, or pace. (Tr. 394-407.)

_____

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*

In September 2003, Kuehner was evaluated by a counselor at the Bowen Center, who recommended that Kuehner would benefit from counseling and medications. (Tr. 47.)  She found Kuehner to have good insight and average intelligence. (Tr. 646.)  Kuehner was assigned diagnoses of bipolar I disorder, depressed, moderate; and PTSD. (Tr. 647.)

On March 24, 2004, Kuehner began individual therapy sessions with mental health counselor Susan Miller. (Tr. 611-13.)  She treated her twice a month through October 2006. (Tr. 1025.)

On April 9, 2004, Kuehner was re-evaluated by Dr. Candace Martin. (Tr. 500-03.)  Test results were similar to those of the prior evaluation. (Tr. 500-03.)  Dr. Martin opined:

> It would seem that [Kuehner] is able to function independently, being limited only by her physical limitations.  With respect to work related activities, without consideration of her physical complaints, it would seem that she is capable of gainful employment should her treatment for ADHD and depression be fairly successful.  At this time, she seems to be rather angry and may have considerable difficulty interacting in a socially appropriate way with authority figures.  She may also have moderate difficulty focusing her attention or sustaining concentration until her ADHD is effectively treated.

(Tr. 502.)  She assigned Kuehner a GAF of 62, indicating mild symptoms, and diagnosed her with adjustment disorder with depressed mood, ADHD - inattentive type, and probable personality disorder. (Tr. 503.)

Upon referral by Ms. Miller, Kuehner was evaluated by a counselor at the Bowen Center on May 12, 2004, and a diagnosis of ADHD was affirmed. (Tr. 599-601.)

On June 28, 2004, Dr. Neville reviewed Kuehner's medical record for the second time and assigned the same restrictions as he did in April 2003. (Tr. 532-45.)  A second state agency psychologist later affirmed his opinion. (Tr. 532.)

On October 6, 2004, Kuehner underwent a psychological evaluation at the Bowen Center

upon referral by Ms. Miller due to concerns of ADHD and a learning disability. (Tr. 633-38.)

The testing supported the diagnoses of ADHD and a learning disorder. (Tr. 638.)

And on February 17, 2005, Kuehner underwent another psychological evaluation at the

Bowen Center due to concerns of a learning disorder when she was attending IPFW. (Tr. 626-

32.) The results of the evaluation supported the diagnoses of a reading disorder and a disorder of

written expression. (Tr. 630.) Her reading and writing skills were substantially below that

expected given her age, intelligence, and education, and were thought to interfere with her

academic achievement. (Tr. 630.)

On October 12, 2006, Ms. Miller completed a mental residual functional capacity

assessment on Kuehner's behalf. (Tr. 1021-23.) She opined that Kuehner had "severe"

functional limitations in activities of daily living; maintaining social functioning; and

maintaining concentration, persistence, or pace; and severe episodes of decompensation (of at

least two weeks in duration) within the last year; the evaluation was countersigned by a

psychiatrist, Dr. Rutten, who managed Kuehner's medications. (Tr. 1022.) Ms. Miller further

articulated that these severe limitations existed since 1988, stating that it is "increasingly vital

that [Kuehner] receive disability benefits." (Tr. 1023, 1025.)

## IV.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are

supported by substantial evidence, which means "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. The Law

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See* 20 C.F.R. §§ 404.1520, 416.920; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On June 11, 2007, the ALJ rendered his opinion. (Tr. 20-31.) He found at step one of the five-step analysis that although Kuehner had engaged in substantial gainful activity since her alleged onset date and earned income, there was insufficient evidence to determine if her work activity had been disqualifying; therefore, the ALJ proceeded to step two. (Tr. 23.) There, the ALJ concluded that Kuehner had the following severe impairments: diabetes, hypothyroidism, PTSD, ADHD, learning disorders, and an affective disorder. (Tr. 23.)

At step three, the ALJ determined that Kuehner's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 23.) Before proceeding to step four, the ALJ determined that Kuehner's testimony of debilitating limitations was "not entirely credible" and that she had the following RFC:

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

[T]he claimant has the residual functional capacity to perform sedentary work. She is able to lift and carry ten pounds occasionally and less then ten pounds frequently. In an eight-hour period, she is able to sit for a total of six hours and stand/walk for a total of at least two but less than six hours. She is also limited to performing simple, repetitive tasks that do not involve working with the public.

(Tr. 23.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four that Kuehner was able to perform her past relevant work as a press tender as she actually performed the job. (Tr. 31.) Therefore, Kuehner's claims for DIB and SSI were denied. (Tr. 31.)

## C. The ALJ Adequately Explained His Evaluation of the Opinion of Ms. Miller and Dr. Rutten

Kuehner first argues that the ALJ failed to adequately explain his evaluation of the opinion of her treating mental health counselor, Ms. Miller, and her treating psychiatrist, Dr. Rutten. Kuehner's first argument is unavailing.

The Seventh Circuit has stated that "more weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, this principle is not absolute, as a "treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner considers the following factors to determine the proper weight to give the opinion: (1) the length of the treatment

relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d); 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, a claimant is not entitled to DIB or SSI simply because her treating physician states that she is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also* 20 C.F.R. §§ 404.1527(e)(3), 416.927(e)(3); *Frobes v. Barnhart*, 467 F. Supp. 2d 808, 818-19 (N.D. Ill. 2006). Nonetheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p; *see also Frobes*, 467 F. Supp. 2d at 818-19.

Here, the ALJ expressly considered the opinion of Ms. Miller and Dr. Rutten, which contended that, among other things, Kuehner was "severely" restricted in her daily living activities; maintaining social functioning; and maintaining concentration, persistence, or pace. In fact, the ALJ penned two lengthy paragraphs on Ms. Miller's and Dr. Rutten's findings. (Tr. 28-29.) The ALJ ultimately concluded, however, that the opinion was not entitled to significant weight because it was inconsistent with other medical evidence of record, including the opinions of Dr. Paul Martin in 2002, who opined that Kuehner had only mild limitations and could return to full-time employment, and Dr. Candace Martin in 2004, who noted that Kuehner had

moderate difficulty in maintaining concentration, persistence, or pace, and with interacting with authority figures but thought that her limitations primarily arose from her physical conditions. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2000) (discounting a treating physician's opinion where it was inconsistent with other evidence of record).

The ALJ further observed that Ms. Miller's and Dr. Rutten's opinion was inconsistent with Kuehner's daily activities, such as going to college, using the computer, and completing household chores without significant difficulty. (Tr. 29.) The ALJ also noted that Ms. Miller's and Dr. Rutten's opinion was inconsistent with the rather sporadic mental health treatment she received at the Bowen Center. (Tr. 29); *see Skarbek v. Barnhart*, 390 F.3d at 503-04.

And, in deciding to assign Ms. Miller's and Dr. Rutten's opinion less weight, the ALJ considered at least some of the factors articulated in 20 C.F.R. §§ 404.1527(d) and 416.927(d). That is, he acknowledged that Ms. Miller was Kuehner's treating mental health therapist, and that Dr. Rutten was her treating psychiatrist. (Tr. 28.) The ALJ nonetheless determined that the inconsistency between Ms. Miller's and Dr. Rutten's extreme restrictions and other medical evidence of record, her daily living activities, and her mental health treatment history was sufficient reason to discount Ms. Miller's and Dr. Rutten's opinion. *See* 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); *see generally Dixon*, 270 F.3d at 1177 ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985))). We will not accept Kuehner's invitation to merely reweigh the evidence at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the

Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence").

In sum, contrary to Kuehner's argument, the ALJ sufficiently evaluated the opinion of Ms. Miller and Dr. Rutten and adequately explained his rationale for assigning it the weight that he did. *See Books*, 91 F.3d at 980 ("All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and to enable] us to trace the path of the ALJ's reasoning." (citation and internal quotation marks omitted)). Consequently, Kuehner's first argument does not merit a remand of the Commissioner's final decision.

### D. The RFC Assigned by the ALJ Is Supported by Substantial Evidence

Next, Kuehner argues that the ALJ failed to give full effect to her uncontrolled diabetes when determining her RFC and that she is incapable of performing sustained sedentary work on a regular and continuing basis. Like her first argument, Kuehner's second argument also fails to warrant a remand.

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1527(e), 416.927(e); SSR 96-5p. The RFC assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20

C.F.R. §§ 404.1545; 416.945. Thus, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.") (emphasis added).

Here, the ALJ concluded that Kuehner had the RFC to perform sedentary work consisting of simple, repetitive tasks that do not involve working with the public. This RFC assigned by the ALJ is consistent from a physical perspective with the opinions of Dr. Kovach, Dr. Diedrich, and Dr. Hamlet, all of whom opined that Kuehner's physical impairments did not affect her daily life activities and assigned her no physical limitations. This RFC is also consistent with the April 2004 opinion of Dr. Pogorelov, to which the ALJ assigned the greatest weight and which stated that Kuehner's physical impairments did not affect her sitting, standing, walking, lifting, carrying and handling objects, speaking, or hearing. (Tr. 24.) Likewise, the RFC is consistent from a mental health perspective with the opinions of Dr. Paul Martin, and Dr. Candace Martin, who both concluded that Kuehner could return to full time employment.

In fact, the *only* medical opinions the RFC was inconsistent with was that of Ms. Miller and Dr. Rutten, who, as discussed *supra*, opined that Kuehner was "severely" limited in all functional areas due to her mental health condition, and Dr. Pogorelov's September 2004 opinion, stating that Kuehner could not stand or walk for two hours in an eight-hour period. Yet, the ALJ confronted these conflicts and resolved them, discounting these opinions after finding them inconsistent with the other medical evidence of record, Kuehner's activities of daily living, and her treatment history. Indeed, "it is the ALJ's duty, not the Court's, to weigh conflicting medical evidence and decide which doctor to believe." *Young*, 362 F.3d at 1001.

Moreover, the ALJ considered other evidence of record as well when determining Kuehner's RFC, such as her daily living activities and the treatment she received. *See* 20 C.F.R. §§ 404.1545, 416.945 (instructing the ALJ to consider *all* of the relevant evidence in the case record when assessing a claimant's RFC); *Earnest v. Astrue*, No. 1:06-cv-714-JDT-TAB, 2007 WL 2904067, at *11 (S.D. Ind. Sept. 29, 2007) (stating that an ALJ should consider the effects of treatment when determining a claimant's RFC); *Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *13 (N.D. Ill. June 29, 2004) (considering a claimant's limitations in activities of daily living when assigning her RFC). That is, the ALJ observed that Kuehner regularly performs household chores independently, attends college three days a week, and uses a computer regularly. And, the ALJ also considered the fact that Kuehner had received only sporadic treatment from the Bowen Center for her mental health complaints.

In sum, Kuehner's assertion that the ALJ failed to adequately consider the debilitating nature of her uncontrolled diabetes and her ability to perform sustained work is without merit. The RFC assigned by the ALJ is supported by substantial evidence.[5]

### E. The ALJ's Credibility Determination Should Not Be Disturbed

Kuehner also contends that the ALJ erred by failing to point to "specific reasons" for finding her testimony of debilitating limitations "not entirely credible." (Reply Br. 5; Tr. 25, 29.) Kuehner's final challenge to the ALJ's decision also falls short.

---

[5] Kuehner also argued in her opening brief that the ALJ's determination that she could still perform her past relevant work was "wholly inconsistent with the evidence presented." (Opening Br. 13.) However, she abandoned this contention in her reply brief, advancing no further argument on the matter. *See generally Mercatus Group LLC v. Lake Forest Hosp.*, 528 F. Supp. 2d 797, 817 (N.D. Ill. 2007) (concluding that the defendants appeared to have abandoned an argument where they failed to address it in their reply brief to their motion).

Regardless, the argument is of no moment. Kuehner simply argued that the ALJ's step-four decision that she could perform her past relevant work was erroneous because the ALJ relied on an improper RFC. Of course, the ALJ's RFC is indeed supported by substantial evidence, and thus Kuehner's argument is without merit.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, contrary to Kuehner's assertion, the ALJ did indeed cite several specific reasons for concluding that Kuehner's testimony of debilitating limitations was not entirely credible, including a lack of objective medical evidence, an inconsistency with her daily living activities, and a rather sporadic mental health treatment regime. With respect to the objective medical evidence, as explained *supra*, the ALJ emphasized that several physicians of record opined that her impairments did not affect her daily life activities and thus declined to assign her any physical limitations. *See* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000) ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); *Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *4 (S.D. Ind. June 15, 2006) (explaining that the lack of objective medical evidence is one factor to be considered by the ALJ when making his credibility determination); SSR 96-7p.

The ALJ also considered Kuehner's daily activities, including the fact that she attends

college three days a week, performs all household tasks independently, and is proficient at using a computer, were inconsistent with her assertions of debilitating limitations that prevent competitive employment. On that front, it is proper for an ALJ to consider a claimant's daily activities as a factor when assessing the credibility of a claimant's complaints. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p; *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility). And, as mentioned previously, the ALJ also took note of Kuehner's rather sporadic mental health treatment regime at the Bowen Center. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that claimant's subjective complaints of disabling pain were not entirely credible where the claimant's treatment was "routine and conservative"); *Ross v. Astrue*, No. 08-C-450, 2009 WL 742761, at *3 (E.D. Wis. Mar. 17, 2009) (same); *Christianson v. Astrue*, No. 3:07-cv-00485-bbc, 2008 WL 3559623, at *7 (W.D. Wis. Feb. 6, 2008) (same); *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. 2008) (same); SSR 96-7p.

In sum, the ALJ built an accurate and logical bridge between the evidence of record and his conclusion that Kuehner's testimony was not entirely credible, and his determination is not "patently wrong." *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, should not be disturbed.

## VI.  CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties.  NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b).  FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 18th day of August, 2009.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge